Good morning, Your Honors. David Carpenter for Appellant ExxonMobil Corporation. I'd like to try to reserve two minutes for rebuttal, but I will monitor my own time. It's a fundamental principle that a party is entitled to instructions on its theory of the case when they're supported by the law and have a foundation in the evidence. Here, Exxon requested, but was denied, jury instructions based on the California Supreme Court's decision in Langley. For this argument, I wanted to cover why Langley applied and was vital to Exxon's theory of the case, why the instructions as given were incomplete and therefore presented a misleading and erroneous statement of the law, and why that error was prejudicial and requires reversal and remand. The key context for this case is the ongoing course of dealing between Edison and the refinery, which was its largest customer. Going back to the 1990s, Edison set out to investigate service complaints made by the refinery. Around the same time, the refinery demonstrated an ability to engage in self-generation of its own electricity. In the course of that investigation, which resulted in the 1992 reliability report, Edison recognized that traditional continuity of service, what is adequate to keep people's lights on, was not sufficient in the context of the refinery or in other large petrochemical industrial operations, because with those kinds of operations, even brief interruptions in power, brief dips in the voltage, could have extraordinary impact. Week-long shutdowns from a two-second dip in voltage, major production loss, safety concerns, environmental hazards. It was based on this recognition that Edison committed to saying, we're going to redefine customer service in this context. One thing I wasn't sure about, Ari, is are you contending you had a contract claim as well? You're not appealing the contract claim, I think, or are you? No, both, Your Honor. All right. The Langley instructions go to both. Were these agreements or whatever they were at that time, were you arguing that they're part of the contract or is it only the tariff of the contract? They're part of the duty to exercise reasonable diligence. Why, I'm asking you. Correct. Yes, Your Honor. That wasn't the question. The question was, are they independent agreements that are entitled to be viewed as contracts independently of a duty of reasonable care? No, Your Honor. We do not present it in that way. But they would be implied terms that would be incorporated into the duty. All right. So you don't regard them as actual enforceable contracts on their own? As an independent contract, I don't believe we made that argument. But I can confirm with you on that one. But what happened coming out of these, the reliability report, is that in recognition of the extraordinary harm that could come to the refinery, Edison committed to certain measures, certain maintenance activities, that it believed were necessary within that context. And it was the failure of those commitments that led to the events at issue in this case. I really think we know all this. Okay. To this point. Okay. Well, the two core principles reflected in Langley, and we talk about the dispute of the duties, is that a utility's duty of care is not simply limited to what would be appropriate or reasonable for the general population. But it's also informed by the knowledge of a customer's particular needs. And it's also that even as to causes when there are electrical disruptions outside of the utility's control, the utility, based on its knowledge, still has an obligation to engage in reasonable steps to help mitigate, such as through notice, unreasonable risk of harm. I mean, the district court's position with regard to the instructions was that the reasonable care instruction encompassed all that. And maybe it would have, but there was also the tariff instruction. So are you contesting the instruction that was actually given on reasonable care? Are you contesting the tariff? You never really objected to the tariff instruction as such, did you? We objected to the tariff instruction as incomplete, as an incomplete statement of law, without the Langley clarifying position, and we objected to presenting the tariff instruction as solely governing the rights and liabilities of the parties. Okay. We provided an alternative statement of the tariff instruction in our jury instructions as well, which I believe was special instruction number 48, but I confirmed that as well. But the key here, though, there are two aspects to it. One, under Hunter, what Hunter says is that even when you have a model instruction that on its face is not necessarily wrong, that instruction can still be incomplete and therefore erroneous if it omits a material clarification from the case law. And that's what was happening here. There was nothing in the basic standard of care instruction given that would alert or convey to the jury that it should consider not merely what was reasonable for the general population, but what was specifically appropriate based on particular needs of the refinery. The omission and the lack of clarification from Langley was then compounded by the instructions given in Edison's favor, which specifically directed the jury to Edison's theory of the case, namely the tariffs that they provided the rules and fully govern the rights and liabilities of the parties. That was an articulation of law that Langley said was incomplete, that the Court of Appeal in Mobile Oil said was incomplete, that it was error for the district, for the trial court to evaluate the duty of care based solely on the tariff without also considering the Langley principle of knowledge. What is your view of the law in this situation? A party submits an instruction that perhaps is based in the law but overstates its effect or lards it up in its favor. And the district court says, I'm not giving that instruction. In other words, don't you have an obligation to tailor your instructions so that they actually reflect your principle and not get yourself an extra two or three yards on the? I understand, Your Honor. It is precedent in the Ninth Circuit that when an issue is brought to the court's attention, it has an obligation to revise or reform a potentially argumentative or even misleading instruction once the legal issue is brought to the court's attention. My understanding is that at the last conference on jury instructions, when there was a lot of, there were objections by both sides to the tentative instructions, you never raised this problem then. I understand you raised it before and I understand that he said I don't want to hear it anymore. But once he had actual concrete suggestion, you never said you need to give this additional instruction. Well, that is because at the time that he presented it, he expressly said I consider the Langley principle and I'm not giving the Langley instructions. You mean the day before? The day before, correct. And to say that, you know, I'll hear you on the other instructions, we did not view that as saying we're going to revisit Langley. And under Glover and Medtronic, when you have clearly proposed written instructions, you have a clear statement by the court that they considered and rejected those. I mean, where that left thing is sort of as Judge Payne is saying, that never in the situation in which you knew what instructions were actually going to be given, did you come up with a, you know, a tailored, moderate, non-extreme version of what you wanted him to say. You never said exactly to him what you're saying to us now, i.e., with that tariff instruction. The reasonable care instruction is really not so bad, but if you're going to give that tariff instruction, you have to give this sort of tailored Langley instruction. No, honestly, I believe we did say that. When Edison submitted the tariff proposed instructions on the tariffs, which is substantially what the district court adopted, we included in the objections to that this statement is incomplete without Langley. We objected to a number of those. Harris was a little more extreme, too. I mean, everybody was, as the judge said, everybody was going a little off the reservation. Your Honor, it might have been a different situation if the court said, I see what you're saying about Langley, and I agree, but I don't like the language of your instruction. Can you give me some more tailored language? I will say that I think the instructions as given are pretty close to. . . Can you address the prejudice question, because that's where it seems to me an awful lot of this is in the prejudice question. Oh, on the prejudice question, absolutely. So let's start with the nature of what the instruction was. When you're talking about a negligence and breach of. . . I think it would be more helpful if you just go through each of that, because it's very complicated. There are all these different incidents. Tell us why this construction couldn't matter. Okay, absolutely. If you mind, let me give a brief kind of overall framing, and then I will go through each incident. The key conflict in the duty was Edison saying, we're providing you a level of protection and systems that are good enough for the entire world, and that should be good enough for you. And what our contention in our theory of the case was, well, no, you know what's good enough for the entire world isn't necessarily sufficient for the refinery, and that's where the duty to provide enhanced measures comes in, and that's where the Langley instruction was really important. So let's talk about the January 2012 incidents, because this is where it really fits into those. Those revolve around the primary protection system. Let me ask kind of a sideline question, but if the Langley question is so important to an operation like Exxon's, did you ever try to get that principle incorporated into the tariff? Did you suggest to the utility you should put it in the tariff? I don't believe that suggestion was made, but it's a long-standing Supreme Court decision. It's even been recognized by the Public Utility Commission itself as part of the law. As part of the tariff or some other way? As part of case law interpreting the duty of care in this context. I mean, there are PUC cases that say we recognize Langley as, you know, establishing a certain principle in the case that's adjudicated by the PUC. What do you mean by recognized by the PUC? Correct. That's the Westcom case, and it's in our reply brief, where it talks about the tariffs and the obligations and then says we also recognize the principle in Langley. What case is that? Westcom. Westcom. All right. And it's in our reply brief. Okay, so January. So January 2012. I'm running out of time. This involves the primary protection system. What the primary protection system does is when you have a voltage drop or a fault in the line, it clears it. And there are two layers. There is the primary system that operated very fast. And the utility says if we had told them there's no indication that they could have done anything that wouldn't have made any difference, B, if we had told them about the problem with the primary backup system, B, as I understand it, it wouldn't have made a difference in terms of the ability to avoid what actually happened, which was sort of this crazy stuff about balloons and fires and all that. It wouldn't have made a difference. And that was all disputed by Exxon's witnesses, including the expert who said that there was stuff they could have done, especially because what was going on on January 7th was a false trip. It was a nuisance trip, not an actual defect in the system, but it was a miscommunication. And for that reason, they decided, Edison decided, to take the line off indefinitely without even telling Exxon what was going on. And Exxon... They didn't take the line off. They took the backup system off. They took the primary protection system off. But not the line. But the electricity was operating. Correct. I'm sorry. Yes, they took the protection system off. They left only the backup system on. But they knew that the backup system was not fast enough to clear events to keep the subfinery safe in the event of a fault. But if it didn't actually make a difference at the time when there was an event, then what was the prejudice? No, but the argument and the testimony from Exxon is that it did make a difference, that if they had investigated immediately, there are things they could have done to keep the system going. At a minimum, they could have... But wait a minute. Oh, pardon me. The electricity was on, right? Correct. It wasn't until a couple of days later when the balloon came and the fire came and all that that the electricity was endangered, right? Correct. Correct. I believe that the utility's argument is the faster system couldn't have fixed that either. No, Your Honor. That's not the utility's argument. The utility's argument is that even if we had investigated immediately or given them notice, there's nothing that we could have done to fix the fast system in time. And what we disputed was... I thought that's what Judge Berzon just asked you. I believe what Judge Berzon just asked was that they said if the fast system were operational, it wouldn't have caught the voltage drop. Both, I think. Okay. I think it was undisputed that if the fast system were operational on January 9th, there wouldn't have been a problem. It would have fixed the voltage drop and there wouldn't have been any issue. The question was whether on January 7th, Edison could have taken things to get the system back online in time or at a minimum provided notice so that Exxon could take mitigation. Such as what? Telling Exxon, hey, we're taking this offline, at which point Exxon could have investigated and gone into mitigation measures, such as bringing more crew on, looking at resetting their machinery, or simply working through with Edison ways of getting that system back online faster because that's most likely what the response would have been. The fact that they didn't... Isn't Langley just one of the factors that is to be considered as part of the analysis of the reasonable care that's taken? Is that right or wrong? It's just one of the factors. It is a material factor. The answer is it's one of many factors, right? Correct. I mean, there is still an overall reasonable, yes, yes. And then you argued this, and both sides argued this to the jury, right? Correct, Your Honor. And you argued it in context of both the negligence claim and the breach of contract claim, didn't you? That is correct, Your Honor. So they were fully aware of that, even under the instructions that were given? Correct, Your Honor. Now, let me ask you this. If, in fact, you're wrong about the instructions, 49 and 51, what's the impact of giving six? And, in other words, isn't this just a harmless error, and what do you say as to the harmless error analysis? I apologize. We say if we're wrong about whether it... If it's all right for the district court to have given five as the basic instruction and to reject 49 and 51 of yours, and then the district court also gave number six, I believe, on the tariff, what is your analysis about whether that is just harmless error because the jury was basically instructed correctly anyway and would have come to the same result under the harmless error test? So our contention is that it was error to exclude the Langley principle and that six, presenting six, the tariffs, as the sole governing rules is an incomplete statement of the law under Langley. But suppose we don't find that that was presented that way. Suppose we find that five was okay, and if it had just been five, the result would have been fine for the jury. They would have been able to determine what they want. But now you have six. What's the complicating effect on six? And is giving of six in the face of five, is that just harmless error? Well, no. So if you were only to give, let's say, the world where there's only one general negligence instruction and both sides fight it out, that might be one thing I would argue that would still be entitled to instructions in our theory of case under Hunter. But here you have instructions specifically directing the jury to Edison's theory of the case based on the tariffs and based on custom practice. So the jury has been expressly instructed on their side. But this instruction had a caveat that seemed to wash it out. So it didn't seem to mean anything. Well, it was significant when Edison was able to get up and specifically direct the jury to instructions that indicated it should be considering certain factors, whereas Exxon did not have the same benefit. And it is established that the argument by counsel does not make up for the failure to provide proper instructions. And it's similar to the situation in Hunter, where Hunter said the error in the incomplete instructions is that it may well have led the jury to disregard the plaintiff's evidence in favor of the defendants. Here we had the defendant got specific instructions on the tariff, got specific instructions on custom and practice. They point to those in closing argument, and we did not have instructions specifically helping us. I see I'm over. So thank you very much, and we will give you a minute. Thank you. Thank you. What is your view on the harmless error issue where 5 was the basic instruction and 6 was the tariff? And let's suppose that it was error to give 6 the way it was given, or error not to give 49 and 51, but on balance it's giving the jury the decision on the basis of instruction 5 and 6 was simply harmless error. What do you say about that? Your Honor, I'd say two things. One, with respect to the interaction between instructions 6 and 5, Exxon argues that the jury might have been misled, but the record reflects there's no basis to assert that. First, there's nothing in the instructions. Wouldn't an ordinary person read this as essentially a further explication of what is reasonable diligence in this area, in this context, and read it as saying that they can't guarantee a continuous and sufficient supply and it's not liable for interruption if it hasn't caused it, and not providing, both of which seem to wash out two of the major issues that are being raised without the caveat that there's some obligation to try to avoid that based on knowledge of the particular person's situation. I mean, it does seem, I mean, often instructions are given. You give a general instruction and then you give a contextual one, and that's what this seemed like. We would agree with that, Your Honor, that 6 was an amplification of a specific area that's covered by 5. All right, so the question is whether 6, but doesn't that wash out the generality of 5? No, Your Honor, in the following sense. First of all, the jurors were specifically instructed, and I direct the Court's attention to Instruction 1, which is in Supplemental Excerpts of Record, page 3. The jurors were instructed specifically that they had to pay attention to and follow every single instruction. They could not ignore any instruction. So the instructions themselves told the jurors that they had to pay attention to and follow Instruction 5. In addition, even if they weren't instructed in that respect, there's a well-settled, it's well-settled law that there's a strong presumption that the jurors will follow each and every instruction that they're given. But these are interacting instructions as to which you just agreed, that the second is essentially an amplification of the first. So the notion that they're supposed to follow the instructions is the second one is essentially telling them what reasonable diligence is under these, in this particular context. Well, Your Honor, Instruction 14 covers a more narrow context than the general duty of care, and that's perfectly consistent with the Langley decision. The Langley decision talks about the tariffs in the initial section of the decision. Well, Langley talked about a tariff that was very similar to this one and essentially said, but that isn't the end of the story. Correct, Your Honor.  And then discuss the general duty of care applying in that context. You were asked to talk about harmless error. Could you do that? I'm sorry? You were asked to talk about harmless error. Could you do that? Yes. Well, I can talk specifically about harmless error on the events themselves or harmless error with respect to the interaction between 6 and 5. I wasn't sure what Your Honor specifically wanted. 5 and 6. Okay. So in addition to the jurors having been specifically instructed that they had to follow all instructions, the importance of the standard in Instruction 5 was also reinforced by Instruction 8. Instruction 8 talks about customs and practices, and in that instruction it says customs and practices do not necessarily determine what a reasonable person would have done in the situation of either party. So, in other words, it was reinforcing to the jury that that standard in Instruction 5 applies specifically in the context of how the jury should take into account customs and practices evidence. In addition, Instruction 5 is explicit that it applies to both parties. The third paragraph of Instruction 5 says you must decide how a reasonably careful person or entity would have acted in the situation of either party. So it, by its terms, was specifically applying to both Exxon and Edison. And, Your Honor, part of what is missed in Exxon's argument in this respect is that the court had to instruct about the tariffs. The tariffs, CPUC tariffs, are considered law. They were also incorporated into the parties' agreements. And you have a breach of contract claim here. So the court, it would have been error for the court not to have instructed about the tariffs. And I understand that their argument is that if they were going to do that, then you had to also give a more specific kind of instruction. Not that you shouldn't have done it, but you should have also had a Langley instruction. Well, Your Honor, yes. And I would say that that is based on the false premise that Instruction 5 did not appropriately capture Langley. Langley says you have to, if there is knowledge of a customer's needs, so it's, in effect, a trigger. If a utility is aware of a customer's needs, then the general duty of apply, that is, the duty to act reasonably under the circumstances. As the trial court found in denying Exxon's new trial motion, that standard of care, how it was articulated in Langley, reasonable under the circumstances, and how it was articulated in Instruction 5, act as a reasonable person would do in the same situation, are virtually indistinguishable. Okay. It would be helpful to me if you could talk about the other kind of harm that's there. That is, if there was an instructional error here, why was it harmless? Yes. Well, the first area of harmless error, I would say, Your Honor, is that, as Your Honors was observing during Exxon's argument, it was crystal clear during trial that knowledge evidence was deemed relevant. In fact, the trial judge during trial gave specific instructions as knowledge evidence was coming in, as certain knowledge evidence was coming in, that it was to be considered for the purpose of assessing Edison's knowledge and that the jurors could take that into account in their deliberations. So throughout the course of trial, based on the evidence that was presented at trial, the in-trial instructions that were given to the jurors, both parties' opening and closing arguments where both parties talked about their views of Edison's knowledge, it was 100 percent crystal clear to the jury that the jurors needed to take into account or had the option to take into account knowledge, as Judge Payne pointed out. But knowledge is only one among many factors that could be considered in assessing the reasonableness of Edison's behavior. Now, specifically, if Your Honors would like me to address a harmless error as to the specific events, I can do that as well. That would be helpful to me. I don't know about my colleagues. Yes, Your Honor. So in addition to the issue of knowledge having been made clear as relevant information for the jurors to take into account, there were several fundamental issues that plagued each of Exxon's claims and these deficiencies would have precluded any recovery as to any of these events. And I'll start with the October 2012 event. That is the capacitor bank event. Setting aside the weakness of the liability case on that event, Exxon suffered... This is the October 2012 event involving a capacitor bank. That's the one where Exxon said Edison should have washed its equipment more regularly. And I can address the liability, the weakness in the liability case, but I think for brevity's sake, the main issue that we can point out to Your Honor is they suffered no damages. Exxon actually ended up netting a profit from that event by selling product into a spiked market that resulted from a market shortage caused by the refinery shutdown. So there was no damages there for Exxon to recover. And this was unchallenged at trial, and Exxon does not address it at all in their briefing. With respect to the January 2012 events, there were three events in all, actually. There were two events on January 9th, and that's the one that Your Honor was talking about with the balloon and the water drop. There was also another event on January 21. Exxon grouped those three events together, but they only presented one damages figure for all three events. So there was one collective damages figure for all three events, which means that if they did not prevail on any one of the three events, they had no viable damages figure for any individual event. And there was zero evidence of liability with respect to the January 21 events. I'll address that one just very briefly, because Exxon only relegates to one footnote in their footnote two of their opening brief, their theory of liability for the January 21 event, and that had to do with a circuit breaker recloser issue. But Exxon ignores that their own expert disavowed that sole theory of liability at trial. And we discussed that in the briefs, but that language is at supplemental excerpts of record 981 through 985, and also supplemental excerpts of record 669 to 671. That's Edison's expert speaking about what Exxon's expert said. So they say nothing about that at all in their reply brief, and if Exxon can't prevail on the January 21 event, they can't prevail on any of the events. Their damages figure was also presented as the total damages that they incurred. I don't understand that part. You seem very focused on the damages, but if they didn't present the damages right, the jury couldn't assess damages? I'm sorry, say that one more time. The jury couldn't come up with their own damages figure? Or discreetly? Well, actually, the jury in the verdict form indicated zero damages on every event. If they had thought that there was liability, we're talking harmless error now. Yes. Why was the jury bound by whatever the jury came up with? I'm sorry, Your Honor. I was looking for more substantive questions than getting into all this damages stuff. The other point, too, about they were selling into a spiked market, that would have been quite complicated for you to prove, it seems to me, if they had come up with a number. I'd like to know would the instructions have mattered on liability? Would the matters of instruction? So, Your Honor, with respect to – then I think to some degree, Your Honor, we come back to the issue of if the instruction – You know, by not answering this question, you're making me wonder. You seem very resistant to answering, to going through each individual instance and showing me why the instruction would not have affected the liability, and I'm beginning to think it would have. So, Your Honor, the issue on liability, to some degree, comes back to the knowledge issue, which is their argument is that without that instruction, the jury wouldn't know that they should take into account this knowledge evidence. So, first of all, throughout the trial, it was reinforced over and over and over again. You just got answering the question. I'm sorry, Your Honor. With respect to the liability issue on January – You're saying they would have known, the instructions were okay, there were no damages, but you're not saying that if we thought that they wouldn't have known or that the instructions shouldn't have been given, that as to each of the incidents, there would be a problem. I understand, Your Honor. I'm sorry for not answering your question earlier. Let me say this. With respect to the knowledge issue as it pertains to liability, the – that issue pertains specifically to the January 9th event. That's where they say, well, you should have notified Exxon about the disabling of the primary protection system. So that issue is really specific only to the January 2012 events. And as to those events, they presented no evidence about what difference it would have made had they been notified. They presented – they did not present evidence about what – whether it would have made any impact on the refinery, what difference it would have made in terms of how they experienced the fault. They did – they presented kind of speculative evidence. Well, here's what maybe we would have done. Maybe we would have changed the settings, but, Your Honor, their own witness testified that changing the settings on their own protective systems would take months. That's – Iris Yoon testified to that in supplement – and we have the supplemental excerpts of record 1139 through 1141. So even if they had been notified, they presented no evidence of what difference it would have made. In addition, Your Honor, their own expert acknowledged – again, speaking about the January 2012 events – their own expert acknowledged that the refinery would have suffered some damages either way. Even if the primary protection system had been in place at the time of the events, they would have suffered damage either way, and they did not explain what difference it would have made at the refinery. So they did not present, in fact, this alternative case about what would have happened if they had been notified. What about the washing, cleaning instances? Well, Your Honor, on that event, the issue was – setting aside the damages issues – that Edison – A, their washing schedule was the same as it went back – same as it was for – this is for the substation equipment. It was the same as it was going back years and years all the way back to the early 90s period where they were talking about the reliability report. I thought they said there was an agreement to do it more often. Well, that, Your Honor, was specific to what were called, quote-unquote, circuits. The circuits, as explained in testimony at trial, had to do with lines, not substation equipment. And the event in October of 2012 involved substation equipment. Even Exxon's own witness in trial acknowledged that the term circuits was interchangeable with the term lines. And we had testimony at trial from the author of the report that the reference to increasing the wash schedule for circuits was specific to lines and had nothing to do with substation equipment. So this – What would you say is the effect of notice on the washing incident? In other words, their theory is that you were – by virtue of Langley, you were required to give notice. What would have happened, according to the trial record, if notice had been given of the washing schedule? Your Honor, nothing. It would have made no – Nothing in the record? Well, it would have made no difference. And, in fact, what the record shows is that Edison – and we have testimony from Josh Hosso, one of the witnesses at trial about this – was that Exxon actually was aware of the wash schedule, the annual wash schedule for equipment in the substations that were in this same area. This is the substation that was at the refinery property. So they were actually aware – and this is in supplemental excerpts of record 915 through 919 – that Exxon was actually aware that Edison was washing their substation equipment on an annual schedule. Okay. Your time is up. Thank you very much, Your Honor. One minute. Your Honor, based on your questions, my intent is to focus on the prejudice for the three specific events, if that makes sense for my rebuttal. On January 2012, the basic dispute was the reasonableness in disabling the primary protection system. Their experts said that was fine because the backup relay was in place and the backup relay is good enough for the rest of the world. The Langley – Not for – Good enough for the rest of the world. The backup relay is what most of the world uses, and so it was fine to disable the primary protection system. The Langley instruction would have come directly into play there. But you got up and told the jury that, didn't you? It may be good enough for the rest of the world, but it's not good enough for us. Correct. But we didn't have an instruction to point to, whereas they did on custom and practice. There was heavily disputed testimony on the ways in which notice could have helped us mitigate and from our own expert about what they could have done to get the line up sooner on that. When you look at the Caballero decision in evaluating harmless error, and when you look at Hunter, with Hunter the standard is whether the jury might well have been swayed for the plaintiff's case with proper instruction. In Caballero, they essentially say, we see the evidence defendant is arguing for harmless error, but those involve disputed credibility issues and disputes that's not for the appellate court to get into. A lot of these disputes that we're talking about here that they're raising is harmless error. They go to issues of causation, of damages, of comparative fault. Not even the core question of duty. The jury never got to that involved hotly disputed issues between experts and between Exxon's representatives versus Edison's representatives. I can use an example of the wash cycle. There was disputes over when the reliability report said, heavy fog contamination creates a real risk for equipment and insulators and circuits, whether they meant the equipment generally or the line specifically. Our witnesses said, we interpret that to mean the equipment in general, including things attached to it, because why would heavy fog contamination only affect one piece of the equipment but not the other? What would a land grant of the infrastructure have done for that? I think it would have focused the jury on the specific knowledge that the refinery identified through the reliability report and the extraordinary risk of harm that would come to the, sorry, the knowledge that Edison had from the reliability report and the extraordinary risk of harm that the refinery would have suffered. But why would it have changed any confusion about whether it referred to only certain lines or everything? Well, I think with that example as well, they were relying heavily on the notion of a custom practice for an annual wash cycle rather than the recognition of the specific commitments they made for an expedited and more frequent wash cycle. Thank you very much. Your time is up. Thank you both for your arguments in ExxonMobil versus Southern California Edison, and we'll take a 10-minute break. Thank you.
judges: Tashima, Berzon, Payne